## PATTON v FIRST NATIONAL BANK

Ohio Appeals, 7th Dist, Monroe Co

Moore & Moore, Woodsfield, and T. J. Kremer, Woodsfield, for plaintiff-appellant.

Matz & Matz, Marietta, and R. M. Noll, Marietta, for defendant-appellee.

## OPINION

### PER CURIAM

This is the second time that this case has been in this court. At the first trial in the Court of Common Pleas the appellant received a jury verdict against the defendant, the First National Bank of Sardis and its directors, in the amount of $6,982.50. This court found no evidence in the record supporting the verdict and subsequent judgment against the directors and entered final judgment for them. The judgment against the corporation was reversed and the case remanded for a new trial, upon the ground, among others, that the verdict was against the manifest weight of the evidence. The case is reported in 21 Abs 202. Upon the second trial in the Court of Common Pleas, the jury returned a verdict for the bank, sole remaining defendant.

The judgment which was rendered upon this verdict has been appealed by the plaintiff to this court on questions of law, alleging (1), that the verdict is not sustained by the evidence and law; (2), the court erred in rejecting the evidence offered by plaintiff; (3), the court erred in admitting evidence offered by defendant over objection by the plaintiff; (4), the court erred in charging the jury; (5), the court erred in refusing to charge the jury as requested by plaintiff.

On Friday, September 17, 1928, the national bank examiner, who had been making the periodic examinations of the affairs of the First National Bank of Sardis, discovered through the confession of William Goddard, its cashier, that the latter had appropriated to his own use some $15,000 of government bonds which had been left at the bank for safe keeping by various individuals. It develops that the bank had no vault in its banking house and was not well equipped to do a safekeeping business. It developed also that the bank's board of directors had never formally authorized or committed the bank to this branch of banking business. Sardis is a small town, the bank a small bank. Goddard, the cashier, had been cashier for many years, and also a director. Goddard, and a lady bookkeeper were the only employed help in operating the bank and he was the only member of the board of directors with any professional banking experience. Its president, for instance, was a blacksmith, seventy-nine years of age at the date of trial.

Whether authorized or not, Goddard's appropriation to his own use of these bonds was looked upon by the examiner as a defalcation in his duties as cashier of the bank and although we are informed by counsel that the bank had some bad paper also this fact has not bulked heavy enough in eyes of either counsel to warrant much clarifying testimony respecting it. The thing that made most impression at the time was the conversion of the bonds which he had pledged upon three notes, one in his own bank for $4,295, one at the Union Bank of Sistersville for $8,897.48, and one at the First National Bank of New Martinsville for $2,000. One of these notes apparently also bore a forged signature.

Goddard confessed on Friday evening. The examiner told the directors that they must either combine with a stronger bank or be closed by the comptroller. They immediately began negotiations with the Union Bank of Sistersville to this end, which negotiations culminated in a contract by which they sold their assets to the Sistersville Bank and the latter institution assumed their deposit liabilities. The contract was finally signed on the Monday following the Friday ultimatum of the bank examiner, and the physical assets were moved to Sistersville ready to do business there on Tuesday morning. The Sardis Bank had opened for business as usual on Saturday and Monday although Goddard was not in charge. News of the difficulty had apparently not gotten on the street in the meantime and this fact, plus the fact that the minutes of the Friday evening show affirmatively that Goddard's tendered resignation was not acted upon, are probably correctly assumed by the plaintiff to be some evidence, at least, that the directors were taking care that the news be not disclosed until the transaction with the Sistersville bank be buttoned up. In the meantime Goddard had decided that he might escape jail if he made good his conversion of the bonds and got them back for their oyners, although the bank examiner refused to give him any assurance along this line. He talked with his brother-in-law, Urban Patton, brother of the plaintiff, about raising money, and then got in touch with two Mooney brothers, bankers of the Monroe Bank at the county seat of Woodsfield. He told these three of the difficulties in which he found himself. The plaintiff, Ed Patton, had $5,000, on deposit in the Monroe Bank and Dave Mooney called the plaintiff in to a meeting on Sunday afternoon in the directors' room of the Monroe Bank, at which these five were

present. The crux of the plaintiff's case is made by his following testimony in the record:

"Q. What was said to you when you got there?
A. Dave Mooney asked Bill Goddard to relate his story to me.
Q. What did Bill Goddard say.
A. That the Sardis bank was dealing with the Union National Bank of Sistersville and needed $15,000 in order to consummate the deal.
Q. What else did he say.
A. He said the Monroe Bank would let them have $10,000.
Q. Did he say they would give him any more?
A. No.
Q. What did you say.
A. Dave Mooney said to me, you have about $5,000 on your account, and you let them have that. We will fix it up.
Q. What did you say.
A. I said, what do you think about it, Dave? I did not know anything about it and wanted to know what he thought about it and he said, 'it is all right.'
Q. What did you say, if anything, to Goddard?
A. Nothing more.
Q. What was done.
A. They fixed up a note for $10,000, and I gave the Monroe Bank a check for the $5,000.
..* * *
Q. Did you loan any more than $5,000 that day.
A. Yes sir. * * * A note made up, on which my brother, Urban Patton and myself signed as sureties on the $10,000 note and the giving of the check by me to the bank for $5,000."

Patton's later cross-examination developed that Goddard gave him his personal note for $5,000, as evidencing Patton's right to be repaid for his advance of the money, and Goddard personally signed the $10,000 note which Patton endorsed. The First National Bank of Sardis was on neither note.

Thus easily was the plaintiff separated from his $5,000 and a $10,000 endorsement. On Monday, three checks in the appropriate amounts were issued to the three banks in payment of Goddard's personal obligation to them and the "stolen" bonds which he had pledged to secure these notes were returned to the Sardis Bank and were later distributed to their real owners. Goddard denied Patton's story that the

loan was asked in the name of the bank and testified that he had told Patton of the trouble he was in and the purpose for which he wanted the money and how he hoped to raise the money to repay Patton.

Plaintiff's counsels' theory of their law suit is that Goddard had "apparent authority" to bind the bank to such a loan and did bind it, particularly since the money went to pay Goddard's personal notes, thereby releasing the bonds held as collateral and thereby relieving the bank from claims of its customers.

Proceeding then to the errors alleged by the appellant, the court is unanimously of the opinion that the verdict is not against the manifest weight of the evidence.

Judge Bennett believes that the record shows that Goddard had no actual authority to bind the bank and that the testimony in this record is as a matter of law insufficient to support a verdict or judgment based on any "apparent authority" in Goddard to bind the bank to either an actual agreement to repay a loan or to any agreement implied in fact. He feels that Goddard's alleged statement to the plaintiff that the Sardis bank was dealing with the Union National Bank of Sistersville and needed $15,000 in order to consummate the deal (Record page 151) and that it was necessary to save the bank (Record page 211) showed such an unusual situation on its face as to arouse the inquiry of a man of average business prudence; that the fact that Goddard personally signed both notes would have indicated to him that further questions as to the nature of the obligation and transaction were in order; that he never asked a question; that his brother was present and even the simplest question would have brought out the true situation if it had not already been disclosed; that the obligation of a principal for the apparent authority of his agent includes only situations in which "a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in assuming that such agent is authorized to perform a particular act."

Storage Company v Cox, 74 Oh St 284, 294, American Jurisprudence Agency, §§97, 95, 104; 1 Ohio Juris. p. 660; that "Reliance of itself is not sufficient; a mere blind confidence is incapable of giving rise to an ostensible authority, that effect being reserved for a reliance in good faith and in the exercise of a reasonable prudence"; 2 Corpus Juris Secondum Agency, p. 1218; and that Patton on his own story acted "blindly"

and without ordinary prudence and cannot now, as a matter of law, hold the bank for a claimed "apparent authority" which the most elementary precaution or inquiry on his part would have dissipated.

He accordingly feels that the judgment should be affirmed.

Judges Nichols and Carter believe, however, that there was evidence for the jury on this question and that the judgment can not be sustained on this ground.

The second and third grounds of error are as to rulings upon the rejection and admission of evidence. These involve several scores of rulings. Some of them doubtless were wrong. The members of the court have carefully and more or less laboriously gone over them all and will confine their comment to saying that they find no such ruling of sufficient prejudice to warrant reversal for a new trial because of it.

The defendant offered eight requests to charge before argument. Five of these requests were given, while requests numbers 3, 4 and 8 were refused.

We see no escape from the proposition that the first of these requested charges was erroneous and that giving it was prejudicial unless the defendant was entitled to a directed verdict.

It reads:

"1. Request for special charge before argument. By defendant. If you should find by a preponderance of the evidence, that the First National Bank of Sardis, Ohio, had never established or engaged in the keeping of bonds and securities of customers for safekeeping, and that William Goddard, cashier, had without the knowledge or authority from the president, vice president, or other members of the board of directors, taken secretly from customers bonds and securities, and had appropriated them to his own use, without the knowledge and consent or approval of the president, vice president and other members of the board of directors, of the said bank, the bank would not be liable even though such bonds were for a time in the banking room of the defendant, the said Sardis Bank."

This charge tells the jury flatly that "the bank would not be liable" if they should find (1), that the bank had never "established or engaged in the keeping of bonds and securities of customers for safekeeping" and, (2), that Goddard had appropriated the bonds without the knowledge of the bank's officers. This is certainly too broad and is certainly prejudicial. It prac-

tically amounts to directing a verdict. Either the first phrase refers to formal entering of the field of "safekeeping" by action of its board of directors, which defendant's counsel have strenuously argued was necessary, or its language is so ambiguous as to lead a jury, as it did this court, to believe that that is what it meant. It would therefore, eliminate the possible liability of the bank for the bonds because of any apparent authority of its cashier to accept them for safekeeping. But what is more, it entirely eliminates the plaintiff's theory that he made a loan to the Sardis Bank, that he knew nothing about any bonds, either their acceptance for safekeeping or their conversion by Goddard and wants his money back, whatever purpose it may have been devoted to. Consequently, unless the defendant was entitled to a directed verdict, this charge in eliminating this claimed ground of recovery must be erroneous.

We believe that the defendant's fifth request should not have been given, but doubt that it was particularly prejudicial. We feel that it is probably too broad as written and even if true, we fail to see anything helpful in it upon the issues which the jury would have to determine.

The defendant's sixth request should not have been given. With reference to the issues, it certainly is ambiguous. What the phrase "such knowledge" refers to is not clear to us. It either means nothing material or might be taken to be saying by implication that the bank could not be liable as a matter of law unless its officers other than Goddard had knowledge of his speculations. We do not understand its implications ourselves and refuse to admit that the jury would be less easily confused than ourselves.

The seventh request should not have been given. Literally, there is nothing wrong with it. The only conclusion in it comes in the last three lines that if he "did not thereafter do any acts as cashier, any acts done by said William Goddard in his individual name and capacity would not bind the bank." We doubt that giving it was in fact prejudicial, but the tendency of all the preamble is to give an incorrect idea as to what the implications of the charge are upon the real issue of fact involved in the alleged secrecy from Friday evening to Tuesday morning.

No exceptions were taken to the refusal of the court to charge before argument fifteen separate requests made by the plaintiff. We construe the first sentence of the new form of §11560, GC, to make excep-

tions unnecessary as a condition to review of any error there may have been in such refusal. We believe that it lay within the discretion of the court to refuse to give each of these charges because with one or two exceptions they were all merely abstract propositions of law.

O. Juris. Trial, §318, §265.

With the purpose of informing counsel and the next trial court of our feeling about their subject matter, we will briefly state our opinion as to each. We note that three of these requests were submitted at the first trial and were disapproved by this court. It is of course the province of counsel who wish to preserve their rights to have such charges given, to resubmit the same despite our disapproval, but we assume from the fact that certain of these fifteen requests were in form applicable to the director defendants, no longer in the case, that this was a matter of carelessness rather than an intention to preserve a right. We might add that the brief of counsel for the plaintiff sets up as error the giving of defendant's requests numbers 3, 4 and 8, although the record shows that these requested charges were not given by the court.

Request No. 1—This request is not an adequate statement of anything. The phrase "and received the benefit of the loan as claimed by the plaintiff herein," would alone be so indefinite as to be—just a guess.

Request No. 2—We believe that this request is inaccurate, both in the abstract and as applied to the facts at bar.

Request No. 3—We believe that the second sentence is too broad and that the applicability of the idea contained in the request as a whole needs amplification as to its application to the case at bar to prevent its being affirmatively misleading.

Request No. 4—This abstract request includes the clause "with knowledge that the agent assumed so to act for him." There is no proof whatever of such knowledge on the part of the bank in this case.

Request No. 5—This request includes language applicable to the director defendants while they were in the case.

We believe the last paragraph to be too broad in saying that a corporation is bound by anything a general agent does even go beyond his authority, particularly a general agent, of the variety defined in the second paragraph of the request. The abstractions of this request illustrate to our minds the difficulty with submitting abstract propositions. It is almost impossible to give abstractions in a complicated case which do not have implications which will con-

fuse or mislead the jury, even when the abstractions may be superficially accurate. This request was discussed in the opinion on the first appeal.

Request No. 6.—This is another entirely abstract proposition possibly too broad in its very last clause and possibly misleading as to the facts at bar unless carefully and directly explained as to the way they applied.

Request No. 7—There is no testimony of the knowledge of the bank as to Goddard's acts unless the knowledge of Goddard was the bank's knowledge. In any event, we do not believe that an unauthorized act of an agent can be held to be ratified by a principal who has no knowledge of it except the knowledge which the unauthorized agent has himself.

Request No. 8—This was discussed in our first opinion.

Request No. 9—This was a completely abstract statement which would have been no help to the jury in deciding any issue before it.

Request No. 10—This was discussed in the prior opinion. It still contains the words applicable to the directors which would probably make a thinking juror wonder if he knew what it was all about.

Request No. 11—This is an abstraction and the "knowingly permits" would require qualification and explanation to fit it to the facts at bar.

Request No. 12—The premises in this request are not justified by the evidence and the conclusion is wrong.

Request No. 13—This was discussed in the prior opinion. We are unable to understand what application this abstraction has to the case at bar.

Request No. 14—There can be no excuse for submitting this request. It is applicable only to the directors who are not parties.

Request No. 15—Despite leaving out the qualification of preponderance, we believe this request is probably proper enough but we can not see how a failure to give it ought to be reversible error because all it amounts to is to saying the almost self evident fact that the plaintiff could not be bound by information he did not have. We do not understand the argument of defendant's counsel on this charge. They say that the request is bad because it would permit Patton to recover although the Monroe Bank itself could not recover because it had knowledge that Goddard was a defaulter. The Monroe Bank's only claim against any one was based on the note signed by Goddard and the two Pattons and would be unaffected by any knowledge it had of Goddard's defalcation.

The case is reversed for error in the charge before argument.

NICHOLS, PJ, and CARTER, J, concur.
BENNETT, J, dissents.